## A99A0563. LUNDGREN v. THE STATE.
### (518 SE2d 908)

Judge Harold R. Banke.

Clifford Lundgren appeals his conviction for disorderly conduct for which he received a year's probation and a $1,000 fine.

The underlying case arose while Lundgren was attending classes at the Federal Law Enforcement Training Center ("FLETC"). Late one Friday night after returning from an evening out, Lundgren became embroiled in a minor scuffle with three fellow students. Lundgren and the others were transported to a FLETC security office but were not placed under arrest. Although Lundgren declined an offer for medical treatment, EMT's were called anyway. While awaiting the arrival of the EMT's, notwithstanding his somewhat intoxicated condition, Lundgren acted respectfully toward the officers, repeatedly stated that it was all his fault, and apologized to the others. Despite holding his arm as though in pain, he continued to insist that he was okay.

When EMT Ginger Fernandes arrived, Lundgren again refused treatment. While sitting hunched over on a bench, Lundgren told her at least three times that he did not want any medical treatment. Unbeknownst to Lundgren, Fernandes wanted to obtain his name so that she could complete a refusal form. When Fernandes yet again asked for his name, he responded, "I don't think so." When she repeated that question, and was leaning directly over him, Lundgren mumbled, "You have nice tits." When she asked him, "What did you say?" he again mumbled, "You've got nice t—s." According to Fernandes, after she informed Lundgren, "You know, I don't appreciate that," he repeated the comment. Fernandes complained to a security officer that Lundgren was harassing her and that she wanted to press charges for sexual harassment.[1] Upon overhearing that news, Lundgren then said, "Oh, well, no, I said you had ugly t—s." According to the closest security officer standing just a few feet away, he did not hear Lundgren use any loud, boisterous or profane language. Nor did the evidence indicate that anyone other than Fernandes heard

---

[1] Fernandes remarked several times, "I want to make sure he's home for the Easter bunny." The events occurred on the day before Easter and her wish apparently came true. Lundgren was immediately dismissed from the FLETC and was sent on the first available flight back to his home in Alaska.

Lundgren's comments.

Fernandes testified that she informed the FLETC that she wanted an apology from Lundgren when he was sober. Lundgren, in fact, sent her a note and flowers, and telephoned her to apologize. She testified that Lundgren's "rude and unbecoming language" offended and "disgusted" her.

Lundgren explained that he meant no harm by his remark and intended it as a compliment. According to Lundgren, it was a "triggered response" to his noticing her breasts. He testified, "It was more or less that she was leaning over and all of a sudden I noticed, I went, gee and it just turned on [a] switch. I said something that in normal sobriety I never would have said, but in that particular moment in time, it just came out. . . ." When he reversed his "compliment," he was "trying to make humor out of the whole situation."

A videotape captured the entire exchange. Although some of the conversation is inaudible, Lundgren's actions and demeanor do not exhibit an effort to provoke an immediate breach of peace. Nor does Fernandes appear to be outraged or incited. No yelling, no spectacle, no confrontation occurs. Nor does Lundgren address his apparently private remarks to others in the room. After this brief conversation, the video shows Fernandes calmly leaning on a counter, filling out some paperwork with her back to Lundgren who remains seated. *Held*:

In his sole enumeration of error, Lundgren contends that the trial court erred by denying his motion for directed verdict of acquittal. Lundgren was charged under subsection (a) (3) with disorderly conduct by: (1) without provocation, (2) using to another in such person's presence, (3) opprobrious or abusive words, which by their very utterance tend to incite an immediate breach of the peace.[2] OCGA § 16-11-39 (a) (3). This subsection of the statute is designed to punish "fighting words" which by their very utterance tend to incite an immediate breach of peace. *Rozier v. State*, 140 Ga. App. 356 (231 SE2d 131) (1976). To ensure no abridgment of constitutional rights, the application of OCGA § 16-11-39's proscription on "fighting words" must necessarily be narrow and limited. *Williamson v. State*, 249 Ga. 851 (295 SE2d 305) (1982).

Here, at issue is whether Lundgren's vulgar comments also constituted language so opprobrious or inherently abusive as to be "fighting words" within the meaning of the law. *Crolley v. State*, 182 Ga. App. 2, 3-4 (354 SE2d 864) (1987); see *Brooks v. State*, 166 Ga.

---

[2] "[W]ords which as a matter of common knowledge and under ordinary circumstances will, when used to or of another person in such other person's presence, naturally tend to provoke violent resentment, that is, words commonly called 'fighting words.'" OCGA § 16-11-39 (a) (3).

App. 704, 705-706 (305 SE2d 436) (1983) (gesturing at a police officer and yelling to a large crowd of 150 to 200 people that "cops are dogs," constituted "fighting words").

State law no longer criminalizes the use of unprovoked language threatening an immediate breach of peace, which is obscene, vulgar, or profane, that is directed to a person older than 14 years of age, unless such language also constitutes "fighting words." *Crolley*, 182 Ga. App. at 4; see OCGA § 16-11-39 (a) (4). The remarks at issue, although certainly rude, crude, and socially unacceptable, were not "sufficiently belligerent to incite an immediate breach of the peace." *City of Macon v. Smith*, 244 Ga. 157, 159 (259 SE2d 90) (1979); compare *Johnson v. State*, 143 Ga. App. 826-827 (240 SE2d 207) (1977). While we do not condone these remarks, they cannot fairly be characterized as "fighting words" in the circumstances and context in which they were said. Therefore, Lundgren's conviction cannot stand. *City of Macon*, 244 Ga. at 159; *Crolley*, 182 Ga. App. at 5; *Rozier*, 140 Ga. App. at 356 (conviction reversed because uttering "[h]ow about some pussy?" to a 16-year-old female did not constitute "fighting words").

Disorderly conduct is a crime against the public order and is codified as such. It is not a private, personal tort. For that reason, we are perplexed by the vagueness of the statutory definition of "fighting words" in OCGA § 16-11-39 (a) (3). What might be fighting words to one person might not be to another person. It is not inconceivable that someone might consider the words at issue here to be complimentary rather than offensive. Compare *Tucker v. State*, 233 Ga. App. 314, 316 (2) (504 SE2d 250) (1998) (evidence of Tucker's hostile, loud, and argumentative conduct, coupled with his utterance of abusive and opprobrious phrases like "f—in," "fu-you," "d-n," and "g-d-n," "f-ing c-nts," supported jury's finding of "fighting words"); compare *Nunn v. State*, 224 Ga. App. 312 (1) (a) (480 SE2d 614) (1997) (defendant's "defiant, violent, and profane conduct" while using "disgustingly profane words which disparaged the dignity of motherhood, childhood, and the intellect of law enforcement officers" constituted "fighting words"). As written, this subpart of the statute is in the same vein as the old vagrancy law which created constitutional problems. To avert similar unwarranted prosecutions, we are hopeful that the Legislature and the Supreme Court will carefully examine this definition and craft one that is more specific, less vague, and less susceptible to misapplication.

*Judgment reversed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED JUNE 3, 1999.

*Lane & Crowe, Robert L. Crowe*, for appellant.
*Richard H. Taylor, Solicitor*, for appellee.